United States Courts
Southern District of Texas
FILED

*June 29, 2020*

David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Criminal No.** |
| | § | |
| **MARCUS SCHULTZ,** | § | **4:20-cr-270** |
| | § | |
| **Defendant.** | § | |

## <u>INFORMATION</u>

THE UNITED STATES CHARGES:

## <u>General Allegations</u>

At all times material to this Information, unless otherwise specified:

### <u>Relevant Market Background</u>

1.     Natural gas was an energy commodity that was traded by buyers and sellers who bought and sold natural gas through different types of commercial transactions.

2.     One way to trade natural gas was to buy or sell a "futures contract." A futures contract was an agreement that obligated the contracting parties to buy or sell a product or financial instrument at a fixed quantity and price for delivery at a specific date and time in the future.

3.     Futures contracts were traded on exchanges—designated commodities markets regulated by the United States Commodity Futures Trading Commission ("CFTC"), including the New York Mercantile Exchange, Inc. ("NYMEX") and the Chicago Mercantile Exchange ("CME"), which operated through servers located in or around Chicago and Aurora, Illinois, and ICE Futures U.S., Inc. ("ICE"), which operated through servers located in or around Chicago, Illinois. ICE, NYMEX, and CME each listed different products for trading, including natural gas futures contracts, and determined and enforced rules and procedures for trading on the exchange.

4.      Natural gas traded at different prices at different physical delivery points throughout the United States.  "Henry Hub"—the delivery location (or hub) near Louisiana's Gulf Coast that connected several intrastate and interstate pipelines—was used as the standard pricing reference for natural gas futures contracts.  The price of natural gas was driven by supply and demand, which was impacted by various factors, including stored gas reserves and the weather.

5.      The exchanges offered the opportunity to trade in Henry Hub futures contracts, which were priced based upon the price of natural gas at the Henry Hub delivery point during specified time periods.

6.      A trader could place an order either to buy (a "bid") or to sell (an "offer") a certain quantity expressed in the number of contracts of a specific futures contract.  An order was "filled" when a buyer's bid price and a seller's offer price matched for a particular futures contract.  A trader who purchased a commodity established a "long" position; a trader who sold a commodity established a "short" position.

7.      Offsetting trades were opposite transactions for an equal number of contracts of the same delivery month that liquidated a purchase or sale of futures contracts and "closed" a position.  By offsetting a futures contract, a trader canceled any delivery obligation of the underlying commodity.  The net gain or loss on the trade was equal to the difference between the price of the futures contract when the trade was initiated and the price when it is offset.

8.      Futures contracts could be traded on exchanges directly through their electronic platforms or through a registered broker who served as an intermediary to match a willing buyer and seller.  After matching a willing buyer and seller, a broker then submitted the executed trade to an exchange for reporting and clearing.  Brokers were prohibited from taking the other side of a customer's order absent written consent from the customer and compliance with exchange rules.

9.      With limited exceptions, all purchases and sales of commodity futures must be executed openly and competitively.  One exception to this requirement was for certain trades, such as block trades, that complied with specific requirements under the exchange rules.  Block trades were permissible, privately-negotiated transactions that met certain exchange-determined quantity thresholds and were reported to and entered on the exchange for price reporting and clearing. While block trades were not negotiated on the open market, under exchange rules, block trades were required to be executed at fair and reasonable prices, taking into account, among other factors, the circumstances and prices of the market.

10.      Fictitious sales were prohibited trades that were not bona fide, arms-length transactions.  Trades that negated market risk and competition, such as prearranged trades that were noncompetitive trades based on an express or implied agreement or understanding and predetermined terms, and accommodation trades that were noncompetitive trades intended to assist another person's illegal trades, were considered prohibited fictitious sales.

## Relevant Entities

11.      "Company A," located in Houston, Texas, was an energy company that engaged in, among other business, the trading of natural gas products in the United States.  Company A was a customer of Brokerage Firm 1.

12.      "Brokerage Firm 1" was a registered brokerage firm in Houston, Texas, that provided brokerage services in various energy markets in exchange for commission fees.  Among the services Brokerage Firm 1 provided was to facilitate block trades in natural gas futures contracts between its customers and others in the market.  Brokerage Firm 1's customers considered information pertaining to their trade orders and block trade requests to be confidential, non-public information to be used by Brokerage Firm 1 only to locate a trade counterparty.

3

13.     "Investment Company 1" was a company established by Person 1 for his personal investments and business.

14.     "Trading Firm 1" was the trade name through which Investment Company 1 operated as a trading firm.  Trading Firm 1 operated from the same physical office as Brokerage Firm 1 and employed only two traders.

## Defendant

15.     Defendant **MARCUS SCHULTZ ("SCHULTZ")**, a resident of Houston, Texas, was a natural gas trader at Company A.  During his employment, **SCHULTZ** became head of Company A's Southeast/Gulf Coast trading.

a.      In or around 2016, Company A was acquired by, and became a wholly-owned subsidiary of, an international energy company.  **SCHULTZ** became an employee of the acquiring company.  Any distinction between the companies before and after the acquisition is not material to this Information.  Accordingly, for purposes of this Information, "Company A" refers to the company where **SCHULTZ** was employed, without distinguishing before and after the acquisition.

b.      Pursuant to his employment agreement, company policies and procedures, exchange rules, and CFTC regulations, **SCHULTZ** had a duty not to (1) disclose to unauthorized persons Company A's material, nonpublic information, and (2) use Company A's material, nonpublic information for his own personal benefit or the benefit of others.

## Defendant's Co-Conspirators

16.     "Person 1," a resident of Houston Texas, was the owner, president, and a registered "associated person" of Brokerage Firm 1, meaning he solicited, received, and executed customer

4

orders in exchange for commission fees.  As owner and president, Person 1 supervised others at Brokerage Firm 1.  Person 1 was also the sole member of Investment Company 1 and one of the traders for Trading Firm 1, which he used to trade for his own benefit.  Pursuant to Brokerage Firm 1's brokerage agreement with Company A, exchange rules, and CFTC regulations, for nonpublic information learned through the broker-customer relationship, Person 1 had a duty not to (1) disclose to unauthorized persons Company A's material, nonpublic information, or (2) use Company A's material, nonpublic information for his own benefit.

17.     "Person 2" and "Person 3" were traders in the energy markets, including in natural gas futures contracts.  Person 2 and Person 3 were customers of Brokerage Firm 1 and used Person 1 to broker trades in natural gas futures contracts.  During the relevant time period, Person 2 traded through his own trading firm, "Trading Firm 2."

## COUNT ONE
### (18 U.S.C. § 371 – Conspiracy)

18.     Paragraphs 1 through 17 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

19.     Beginning in or around 2013 and continuing through at least in or around 2018, the exact dates being unknown, in the Houston Division of the Southern District of Texas and elsewhere, the defendant

### MARCUS SCHULTZ

knowingly and willfully, that is, with the intent to further the objects of the conspiracy, conspired and agreed with other individuals, known and unknown, to commit certain offenses against the United States, namely:

a.     to knowingly offer to enter into, enter into, and confirm the execution of a transaction that was (1) of the character of a wash sale or accommodation trade; (2)

a fictitious sale; and (3) used to cause any price to be reported, registered, or recorded that was not a true and bona fide price, and also involved the purchase or sale of any commodity for future delivery if the transaction was used or may be used to (1) hedge any transaction in interstate commerce in the commodity or the product or byproduct of the commodity; (2) determine the price basis of any such transaction in interstate commerce in the commodity; and (3) deliver any such commodity sold, shipped, or received in interstate commerce for the execution of the transaction, in violation of Title 7, United States Code, Sections 6c(a) and 13(a)(2);

b.  to knowingly and willfully use and employ, and attempt to use and employ, in connection with a contract of sale of any commodity in interstate commerce, and for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1(a), by (a) using or employing, or attempting to use or employ, any manipulative device, scheme, or artifice to defraud; (b) making or attempt to make, any untrue or misleading statement of a material fact or omitting to state a material fact necessary in order to make the statements made not untrue or misleading; and (c) engaging, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person, in violation of Title 7, United States Code, Section 9(1), 17 C.F.R. § 180.1(a), and Title 7, United States Code, Section 13(a)(5); and

c.  to knowingly and intentionally devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses,

representations, and promises, and to transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

20.     The purpose of the conspiracy was for **SCHULTZ** and his co-conspirators to:  (a) enrich themselves from the profits derived from fraudulent and unlawful trading practices and misappropriation of material, nonpublic information, and (b) conceal their fraudulent and unlawful activities from Company A, market participants, the exchanges, the CFTC, and law enforcement.

### Manner and Means of the Conspiracy

21.     The manner and means by which **SCHULTZ** and his co-conspirators sought to accomplish and did accomplish the purposes of the conspiracy included, but were not limited to, the following:

22.     **SCHULTZ**, Person 1, Person 2, Person 3, and others known and unknown, misappropriated Company A's material, non-public information and engaged in fraudulent, noncompetitive trades and prohibited fictitious sales, including accommodation and prearranged trades, in natural gas futures contracts for their own personal gain.  By entering into the fraudulent trades, **SCHULTZ**, Person 1, and others caused prices to be reported, recorded, and registered that were not true, bona fide prices.

23.     The fraudulent trades were reported to, entered on, and cleared through an exchange via interstate wire communications.  These interstate wire communications originated from in or around Houston, Texas and were transmitted through ICE, NYMEX, or CME servers located in Illinois.

24.     To execute the scheme, **SCHULTZ** disclosed to Person 1 Company A's material, nonpublic information, including, but not limited to, identity, trade interests, terms, and conditions, such as prices, purchase or sale, quantity, volume, source, delivery points, timing, and thresholds or limits to the terms to which he would agree ("Inside Information") in violation of his duty of loyalty, trust, and confidentiality to Company A, knowing and intending that the information would be misappropriated and used by Person 1, Person 2, and Person 3 to enter into prearranged trades to fill **SCHULTZ**'s orders and offsetting trades for their personal gain.

25.     Person 1 misappropriated the Inside Information in violation of his duty of loyalty, trust, and confidentiality to Company A to match **SCHULTZ**'s orders directly with prearranged counterparties, including Trading Firm 1, Person 2, and Person 3, instead of pursuing a competitive price in the market in an arms-length transaction.

26.     Trading Firm 1 (through or at the direction of Person 1), Person 2, and Person 3 misappropriated the Inside Information, filled **SCHULTZ**'s orders, and entered into offsetting trades in the market at a profit for their personal gain.  **SCHULTZ** made his initial, prearranged bids or offers based on the terms needed to accommodate and make a profit in the offsetting trades, rather than at arms-length, bona fide terms to maximize the profit for Company A.

27.     **SCHULTZ** also disclosed to Person 1 the Inside Information in violation of his duty of loyalty, trust, and confidentiality to Company A, knowing and intending that Person 1 would and did use this information to trade through Trading Firm 1—at times at **SCHULTZ**'s specific direction—for their personal benefit.

28.     Some of this fraudulent trading occurred around the United States Energy Information Administration Natural Gas Storage Report ("Storage Report"), a weekly report that measured the natural gas held in underground storage and any change that occurred the prior week.

The Storage Report impacted natural gas prices and indicated if a market was bearish or bullish based on inventory in the ground.  At times, **SCHULTZ** and Person 1 limited downside risk when trading around the Storage Report by **SCHULTZ** placing an order with Person 1 that Trading Firm 1 could fill, if necessary, to limit any loss exposure.  But for this scheme, **SCHULTZ** otherwise would not have entered into these trades with Trading Firm 1 on behalf of Company A.

29.     The net profits from these fraudulent trades were split between **SCHULTZ** and the individuals involved in the particular fraudulent trade.  **SCHULTZ** received his share of the proceeds in the form of cash and check.  To conceal the source of the payments, the checks were issued through Investment Company 1, Brokerage Firm 1, and Trading Firm 2 and made payable to **SCHULTZ** or his family member.  Starting in or around 2014, **SCHULTZ** used his family member's real estate company ("Real Estate Company") to send and receive funds to conceal the true nature of the fraudulent payments and make them appear to be for a legitimate investment.

30.     **SCHULTZ**, Person 1, and Person 2 agreed to document certain proceeds through a Form 1099-MISC in part to conceal the true nature of the funds and make them appear to be the proceeds of a legitimate investment or legitimate income paid.

31.     From the beginning of the conspiracy and continuing, **SCHULTZ** and his co-conspirators agreed to and did engage in acts to conceal the scheme, including with respect to the nature and structure of their trading and financial transactions, methods of communication and documentation, and in their interactions with others, including, Company A, market participants, the exchanges, the CFTC, and law enforcement.

**Overt Acts**

32.     In furtherance of the conspiracy and to achieve the objects thereof, **SCHULTZ** and his co-conspirators committed and caused to be committed the following overt acts, among others, in the Southern District of Texas, and elsewhere:

33.     On or about May 15, 2015, **SCHULTZ** instant messaged Person 1 and placed an order to buy 642 lots in the ICE Natural Gas Henry Hub LD1 April-October 2016 futures contract at 3.179, which Person 1 filled through Trading Firm 1.

34.     On or about May 15, 2015, Trading Firm 1 entered into three long trades in 214-lot increments at the price of 3.174, 3.174, and 3.176, respectively, purchasing, in total, 642 lots in the ICE Natural Gas Henry Hub LD1 April-October 2016 futures contract to offset its short position from its block trade with **SCHULTZ** at a profit.

35.     On or about July 15, 2015, **SCHULTZ** endorsed and deposited in a federal credit union located in or around Houston, Texas, a check, dated July 14, 2015, from Investment Company 1 to **SCHULTZ** in the amount of $21,029.

36.     On or about November 12, 2015, Person 1 deposited at a bank in or around Houston, Texas, a check, dated November 10, 2015, from **SCHULTZ** to Investment Company 1 in the amount of $22,123.08 with a memo line stating "Loan payback w/ fee and interest."

37.     On or about January 10, 2016, **SCHULTZ** text messaged Person 1's wife, requesting a Form 1099-MISC: "When will you have 1099 this year.  Just working throw [sic] stuff and was going to set up appt with tax guy."  Person 1's wife responded: "I'm hoping to have them done by end of this week.  As soon as I get this stupid phone system working, I can knock those out."

All in violation of Title 18, United States Code, Section 371.

**NOTICE OF CRIMINAL FORFEITURE**
(18 U.S.C. § 981(a)(1)(C); 28 U.S.C. §2461(c))

37.      Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), the United States gives notice that upon Defendant's conviction of Count One of this Information, the United States will seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to the conspiracy.

38.      The United States also gives notice that it will seek a money judgment against the Defendant.

39.      In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exist, the United States will seek to forfeit any other property of the Defendant up to the amount of the money judgment.


Ryan K. Patrick
United States Attorney
Southern District of Texas


By: *Suzanne Elmilady*
Suzanne Elmilady
Assistant United States Attorney
Southern District of Texas
SElmilady@usa.doj.gov
(713) 567-9342

Robert Zink
Chief, Fraud Section
Criminal Division
United States Department of Justice


Jennifer L. Farer
Katie Rasor
Drew Bradylyons
Trial Attorneys
Criminal Division, Fraud Section
Jennifer.Farer@usdoj.gov
Katherine.Rasor@usdoj.gov
Drew.Bradylyons@usdoj.gov
(202) 353-2526


11